DWIGHT, P. J., HAIGHT and BRADLEY, JJ., concurred.

Judgment appealed from affirmed, with costs.

---

In the Matter of the Probate of the Last Will and Testament of ASHER W. MINER, Deceased.

*Will — ambiguous residuary clause.*

A residuary clause in a will provided as follows : "All the rest and residue of my estate both real and personal not heretofore disposed of I give bequeath and devise as follows all of my household goods furniture and effects after the decease of myself and wife to Kate M. Wellman, Myra E. Corbin and Ella Lockwood to be equally divided between them, share and share alike."

*Held,* in accordance with the intention of the testator, as disclosed by extrinsic evidence, and without giving the word "effects" a broad sense, that this clause of the will disposed of the entire residue of the estate, and should not be limited to "household goods, furniture and effects."

APPEAL by Maria L. Mills and others, contestants, from a decree of the Surrogate's Court of Allegany county, entered in the office of the clerk of that court on the 1st day of February, 1893, admitting the will of Asher W. Miner to probate, and construing that part of the will which relates to the disposition of his residuary estate.

*James C. Smith,* for appellants Maria L. Mills and others.

*George Barker* and *A. W. Hickman,* for appellants Simon G. Miner and others.

*Charles B. Wheeler,* for appellant Amelia R. Heath.

*Charles Daniels* and *A. T. Ellicott,* for proponents and respondents. .

LEWIS, J.:

This is an appeal from a decree of the surrogate of Allegany county, the controversy being over the construction given to the fourteenth clause of the will of Asher W. Miner, deceased.

The testator died in the village of Friendship, Allegany county, on the 13th day of May, 1892, aged seventy-eight years. He left him surviving his widow, Electa R. Miner, two brothers, and a large number of nephews and nieces. Mrs. Miner survived her husband but a few months. The testator drew his own will and executed it on the 10th day of August, 1891.

By the first clause of his will, he bequeaths to his wife $20,000 and the use and income of the further sum of $20,000 during her life; also, all his household goods, furniture, fixtures and effects, and all his horses, harnesses, carriages, robes and cutters, and the use, during her lifetime, of all the lands owned by him in the town of Friendship; he directed that the $20,000 devised to her should be paid one-half in one year, and one-half in two years from his decease, with interest from the time of his decease, to be paid quarterly.

The provisions for his wife were to be in lieu of her dower. By the second clause of his will he bequeathed to each of the proponents the sum of $10,000, and provided that any notes or indebtedness he might have against the proponents, or their husbands, at the time of his

decease, should be deducted from the sum devised respectively. By the third clause, he bequeathed to his niece Harriet Hoxie the interest on $4,000 during her natural life, and then follow various bequests to Baptist churches and societies, and to a cemetery, amounting in all to some $27,000.

The fourteenth clause, being the one in controversy, is as follows :

"All the rest and residue of my estate both real and personal not heretofore disposed of I give bequeath and devise as follows all of my household goods furniture and effects after the decease of myself and wife to Kate M. Wellman, Myra E. Corbin and Ella Lockwood to be equally divided between them, share and share alike."

The contestants claim that the testator, by this clause of his will, disposed of no more of his property than his household goods, furniture and effects. The proponents contend that the testator intended to bequeath to them the entire residue of his property.

Mr. Miner resided all his business life in the village of Friendship, Allegany county. He was an intelligent, enterprising, successful business man. He operated to some extent in oil lands, oil and lumber, but his principal business was banking, which he had carried on for many years successfully. He left an estate of the value of from $500,000 to $600,000. Mr. and Mrs. Miner married early in life, but not having any children of their own, they adopted the very commendable plan of taking the children of others, and making them members of their household. The proponent Kate M. Wellman became a member of their family in the year 1846 or 1847, when she was three years of age. The proponent Myra E. Corbin was taken into the family when she was sixteen months old, and the proponent Ella Lockwood when she was eleven years old. They were not legally adopted, but remained members of the family until they were respectively married, and were in all respects treated by the testator and his wife as if they were their natural children.

They were liberally educated, and enjoyed all the advantages and privileges of children of wealthy parents. The relations between the foster parents and these children, from the time they became members of the family until the death of Mr. Miner, were as tender and affectionate apparently as if they had been their natural children.

They were habitually addressed by Mr. and Mrs. Miner as natural children would have been, and Mr. and Mrs. Miner were called and addressed by them as father and mother. They took the family name of Miner; they became members of the Baptist church to which Mr. and Mrs. Miner belonged, were married at the home of the testator, one of them to the business partner and confidential friend of Mr. Miner. One married a Doctor Lockwood, who was at the time a physician residing in the State of Illinois, and she went there to reside with her husband. Mrs. Wellman and Mrs. Corbin continued to reside after their marriages near the residence of the testator. Mrs. Wellman's husband died prior to the making of the will, leaving a family of children. The relations of affection and love between the testator and proponents continued after their marriage. Mrs. Wellman and Mrs. Corbin had children, and the relations between Mr. and Mrs. Miner and these children were such as would be expected between grandparents and grandchildren. The record shows that the love which Mr. Miner had for the proponents was fully reciprocated by them and their children. They were, for all the purposes of giving construction to the will, his natural children. The testator left him surviving two brothers who were his seniors in age. One of them was a farmer residing near the testator; the other was a minister and resided in another State. They were in moderate financial circumstances. His nephews and nieces resided in different parts of the United States. He had given financial aid to the brother who was a minister and to his sisters. His relations with his brothers and sisters and their descendants appear to have been cordial and affectionate. The testator's letters, which were introduced in evidence, tended to show that he was exceedingly considerate of the feelings and comfort of his brothers and sisters and frequently suggested that they should not in any respect embarrass or harass themselves by making payments to him upon their indebtedness.

The testator executed a former will in the year 1885, which was found among his papers after his decease canceled. He unquestionably had that will before him when he drew the will in question, for several of its clauses were copied *verbatim* into the last will. The provisions for his wife were the same in both wills. By the will of 1885 he gave to each of the proponents the use during

their life of $8,000, which was to go to their children after their decease, and in case of the death of either of them without issue the same was to be a part of the residuary estate. The same provision was made in both wills for Mrs. Hoxie ; substantially the same provisions in both wills for the churches and societies. By the thirteenth clause of his first will he gave to the three proponents the use during life of his entire residuary estate and provided on their death it should go, share and share alike, to their children, and that in case either of said devisees should die leaving no children, then the share of said persons dying childless should go to the survivor or survivors of the residuary devisees in equal proportions, thus showing that the testator had in mind at the date of his first will to make the proponents and their children the principal beneficiaries of his large estate, and did not intend that his brothers and sisters or their descendants, with the exception of Mrs. Hoxie, should share in the estate.

By stipulation of the parties, photographic copies of both wills were produced upon the argument. They were both in the handwriting of the testator with the exception of the names and residences of the witnesses. The arrangement of the various clauses of the will, the penmanship and phraseology, show that the testator was a man of intelligence and to a considerable extent familiar with the use of legal language and legal principles. In drafting the clause in controversy he obviously failed to express his thoughts with that clearness that appears in the balance of the will. In writing the wills he entirely ignored the rules of punctuation, for there is not in either of the wills a punctuation point of any kind. In giving construction to this clause of the will we start with the legal presumption against partial intestacy, and in this case that presumption is strengthened by the provisions of his first will, which, as we have seen, was prepared by his own hand and intelligently disposed of his entire estate upon the same general plan as the last will. He contemplated, when preparing the last will, that there would be a residuary estate to be disposed of, for he refers to it three times in the will. It is quite improbable that he used the following important and significant words in the fourteenth clause : " All the rest and residue of my estate both real and personal not heretofore disposed of I give bequeath and devise " and intended that they

would carry only the household goods and effects after the death of his wife. Such a conclusion would impute to him ignorance of the meaning of the words not justified by the evidence. He had, in his former will, given to the proponents only the use of the bequests for life, but it was of the bulk of the estate, amounting to several hundred thousand dollars. By the last will his bequests to them, with the exception mentioned as to deduction on account of indebtedness to him at the time of his death, by the devisees or their husbands, were without conditions. To hold that the proponents only take the household goods by the residuary clause involves a very remarkable and unexplained change in the feelings of the testator towards them between the dates of the two wills. Having by the will of 1885 given to them and their children the great bulk of his estate, if the appellant's contention be correct, by his last will he gave them, in addition to the $10,000 each, only the use of the household furniture after the death of the widow. If such a radical change was intended by the testator, we should expect that some cause for it would appear in the record, and there is an absence of any suggestion of the kind. On the contrary, the proof shows that the kindly and affectionate feelings he entertained for them in 1885 apparently continued down to the time of his death. Having provided in the first clause of his will that his widow should have the use of the household goods, etc., during her life, the insertion of this provision regarding the household goods in the residuary clause, was not necessarily inconsistent with an intention on his part to give the proponents the residue of this estate. He might well have thought her right to it might be endangered if that property was not excepted from the general language of the residuary clause. Had the words, " All of my household goods furniture and effects after the decease of myself and wife" been inclosed by the testator within dashes or curved lines, there would be left no room for doubt that the clause in controversy carried the residuum of the estate. It is our duty to give this construction to the clause in question, if it can be fairly and consistently done, in order to prevent partial intestacy and carry out the intention of the testator.

When a plain and definite purpose is " endangered by inapt or inaccurate modes of expression, and we are sure that we know what the testatrix meant, we have a right, and it is our duty, to subordinate

the language to the intention. In such a case the court may reject words and limitations, supply them or transpose them, to get at the correct meaning." (*Phillips* v. *Davies*, 92 N. Y. 199–204.)

It was held in *Lamb* v. *Lamb* (131 N. Y. 227), that "where the language of a residuary clause is ambiguous, the leaning of the courts is in favor of a broad rather than a restricted construction. It prevents intestacy, which it is reasonable to suppose testators do not contemplate, and if the mind is left in doubt upon the whole will as to the actual testamentary intention, a broad rather than a strict construction seems more likely to meet the testamentary purpose, because such a clause is usually inserted to provide for contingencies or lapses and to cover whatever is left after satisfying specific and special purposes of the testator, manifested in the other clauses of his will. * * * The intention to include is presumed, and an intention to exclude must appear from other parts of the will, or the residuary devisee will take."

It is not necessary to take as great liberties with the phraseology of the clause in question in order to put it beyond doubt that it was intended to devise the residue of the estate as would seem to be warranted by many authorities. It is contended by the counsel for the respondents that the word "effects" in the residuary clause should be held to include and carry the balance of the estate not specifically devised, and many authorities are cited where that word was held to have that effect. We incline to the opinion that the testator did not use the word in so broad a sense, but intended that it should apply to and cover articles belonging to the household furnishings, using it in the same sense as in the first clause of the will. If he used it in the broad sense claimed by the respondents he failed to make any provision for the disposal of the income of the residue of the estate during the life of his widow. We are of the opinion that the testator intended by the fourteenth clause of his will to dispose of the entire residue of his estate to the proponents, but failed to express his intention with that clearness, perhaps, that he would if he had not had the former will before him when preparing the clause in question. He copied the first part of the residuary clause from the first will, and left out of the last will its provisions as to a life interest in the proponents, which accounts partially for the clause failing to express his intention with that clearness that it

otherwise would. The residuary clause was so ambiguously phrased as to justify the admission of extrinsic evidence to aid the court in its interpretation.

The order and decree of the surrogate appealed from should be affirmed, without costs of this appeal.

DWIGHT, P. J., and HAIGHT, J., concurred.

Decree of the Surrogate's Court of Allegany county appealed from affirmed, without costs of this appeal to either party.